UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTHWEST ENVIRONMENTAL
ADVOCATES,

          Plaintiff,

    v.

NATIONAL MARINE FISHERIES
SERVICE and UNITED STATES ARMY
CORPS OF ENGINEERS,

          Defendants

    and

THE PORTS OF VANCOUVER,
WOODLAND, KALAMA, LONGVIEW,
PORTLAND, AND St. HELENS,

        Intervenor – Defendants.

CASE NO.  C04-0666RSM

MEMORANDUM ORDER
DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT
AND GRANTING DEFENDANTS'
AND INTERVENORS' CROSS-
MOTIONS FOR SUMMARY
JUDGMENT

## I.  INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt. #48), Defendants' Cross-Motion for Summary Judgment (Dkt. #54), and Intervenor-Defendants' Cross-Motion for Summary Judgment (Dkt. #55).  The parties essentially ask this Court to determine two issues: (1) whether defendants' channel deepening Final Supplemental

MEMORANDUM ORDER
PAGE - 1

Integrated Feasibility Report and Environmental Impact Statement ("FSEIS") fails to comply with the National Environmental Policy Act ("NEPA") because it does not consider all of the significant direct and indirect impacts of the projects, connected actions and cumulative effects, and because it does not present a complete picture of the projects' economic consequences; and (2) whether defendants' biological opinions fail to comply with the Endangered Species Act ("ESA") because they substitute a qualitative, relative judgment for the analysis of the salmons' present status and the environmental baseline that are necessary to assess jeopardy.

Having reviewed the parties' briefing on these issues, and having considered the oral arguments presented to this Court on May 26, 2005, the Court hereby finds that defendants' decisions were not arbitrary and capricious, and therefore, the Court DENIES plaintiff's motion for summary judgment, and GRANTS defendants' and intervenor-defendants' cross-motion for summary judgment.

## II.  DISCUSSION.

### A.  Background

This case involves a challenge to the Columbia River Channel Improvement Project planned for the Columbia River system and estuary.  The estuary comprises the area where the Columbia River system meets the Pacific Ocean.  It acts as a nursery for young salmon migrating from as far away as Idaho, and provides safe feeding grounds while the salmon make the transition from fresh to salt water.  Originally consisting of multiple channels, wetlands and backwaters, the river now largely consists of a single main channel, and its depth is constantly maintained at 40 feet deep through dredging and pile dike fields.  The projects maintaining the channel are largely conducted by defendant Army Corps of Engineers (the "Corps").

In 1989, at the request of the intervenor Ports and affected local and state governments, the United States Congress directed the Corps to examine the feasibility of improving the 40-foot navigation channel to a maximum of 43-feet, in order to reduce shipping delays and allow

MEMORANDUM ORDER
PAGE - 2

larger vessels to load more fully.  The Corps subsequently released an FEIS in August of 1999, concluding that a 43-foot channel would provide maximum net economic benefits and create transportation cost savings, without causing significantly different environmental impacts from a "no-action" alternative.  During the same time, the National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("FWS") conducted separate studies pursuant to section 7 of the ESA, concluding the same.  In December of 1999, NMFS issued its Biological Opinion regarding the proposed project, and concluding that the project was not likely to destroy or adversely modify any designated critical habitat for certain salmon species.

As a result, Congress authorized the Corps to deepen the existing channel and to conduct ecosystem restoration projects in the Columbia River and the estuary.  This project consists of a series of navigation improvement and ecological measures designed to enhance the region's waterborne transportation and commercial infrastructure as well as to restore the habitat necessary for survival and recovery of a number of salmonids listed under the ESA.  The project is supported by the Corps, along with the intervenor Ports of the lower Columbia River, and by the states of Washington and Oregon.  To date, Congress has authorized $19 million for the project, and Washington and Oregon have appropriated a total of $55.4 million for project construction.

In August of 2000, NMFS withdrew its initial biological opinion and reinitiated consultation with the Corps, in order to evaluate new information regarding bathymetry and flow on estuarine and disposal activities.  FWS also reinitiated its consultation as a result of the new listings of several additional salmon species.  The Corps also began preparing a supplemental EIS ("SEIS") to address concerns raised by Washington and Oregon regarding sediment transport and coastal erosion, changes to the project's restoration measures, the use of additional upland disposal sites, and updated economic information.  The Corps issued that SEIS in 2003.

MEMORANDUM ORDER
PAGE - 3

In the meantime, the Corps, NMFS and FWS jointly engaged a Sustainable Ecosystems Institute ("SEI"), consisting of an independent panel of seven scientific experts, to review and evaluate their scientific analyses. The SEI assisted the Corps in drafting a new Biological Assessment to respond to NMFS and FWS concerns. Ultimately, the SEI concluded that the information considered by the agencies was the "best available science commercially available."

In the 2002 Biological Opinion resulting from this reinitiation process, NMFS determined that the deepening project would not likely jeopardize any listed salmon species. On July 9, 2002, the Corps solicited comments on its draft FSEIS, including the NMFS Biological Opinion. After considering and responding to the public comments, the Corps issued its FSEIS in January of 2003, in part concluding that the benefits of the project would outweigh its costs.

In January of 2004, the Corps issued its Record of Decision ("ROD"). The alternatives selected by the Corps include: (1) deepening the existing 40-foot deep channel and three existing turn basins on the Columbia River to a depth of 43-feet; (2) implementation of six ecosystem restoration features; (3) disposal of dredged material at numerous sites; (4) monitoring, ecosystem evaluations, and adaptive management; and (5) mitigation measures.

The Oregon Department of Environmental Quality ("DEQ") and the Washington Department of Ecology ("WDE") dropped their previous objections regarding sand erosion and accretion, and certified the project.

On February 17, 2005, defendants filed a Notice of Issuance of a New Biological Opinion, along with a new Biological Opinion and Supplemental Administrative Record, that supercedes the May 20, 2002 Channel Deepening Biological Opinion. As a result, plaintiff dropped one of its claims from its initial Complaint.

On March 11, 2005, NMFS issued a new O&M Biological Opinion to replace the 1999 Biological Opinion. The parties agreed that plaintiff's challenge to the 1999 Biological Opinion became moot as a result, and plaintiff voluntarily dismissed its claims based on that opinion.

MEMORANDUM ORDER
PAGE - 4

1    Plaintiff now seeks review of the Corps' EISs for violations of NEPA, and of the

2    biological opinions for each action for violations of the ESA.

3    **B.  Summary Judgment Standard**

4    Summary judgment is proper where "the pleadings, depositions, answers to

5    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

6    genuine issue as to any material fact and that the moving party is entitled to judgment as a

7    matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247

8    (1986).   The Court must draw all reasonable inferences in favor of the non-moving party.  *See*

9    *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds,*

10   512 U.S. 79 (1994).  The moving party has the burden of demonstrating the absence of a

11   genuine issue of material fact for trial.  *See Anderson*, 477 U.S. at 257.  Mere disagreement, or

12   the bald assertion that a genuine issue of material fact exists, no longer precludes the use of

13   summary judgment.  *See California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics,*

14   *Inc*., 818 F.2d 1466, 1468 (9th Cir. 1987).

15   Genuine factual issues are those for which the evidence is such that "a reasonable jury

16   could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.  Material facts are

17   those which might affect the outcome of the suit under governing law.  *See id.*  In ruling on

18   summary judgment, a court does not weigh evidence to determine the truth of the matter, but

19   "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc*., 41 F.3d

20   547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).

21   **C.  Standard of Review**

22   Agency compliance with NEPA and ESA is reviewed pursuant to the Administrative

23   Procedure Act ("APA"), 5 U.S.C. § 706.  Specifically, this Court applies an "arbitrary and

24   capricious" standard of review, which allows the Court to set aside an agency action only if it is

25   "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law."

26

MEMORANDUM ORDER
PAGE - 5

1  5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resource Council*, 490 U.S. 360, 376 (1989);

2  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971); *Selkirk Conservation*

3  *Alliance v. Forsgren*, 336 F.3d 955, 953 (9th Cir. 2003).

4    Under this standard, this Court reviews an agency's decision to determine whether they

5  are "based on a consideration of relevant factors," "whether there has been a clear error of

6  judgment," and to ensure that the agency has taken a "hard look" at the environmental

7  consequences of its proposed action. *Overton Park*, 401 U.S. at 416; *Klamath-Siskiyou*

8  *Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 992 (9th Cir. 2004); *Blue*

9  *Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). The Court

10  also reviews the biological opinions to determine whether the agency "'considered the relevant

11  factors and articulated a rational connection between the facts found and the choice made.'"

12  *Pacific Coast Fed'n of Fisherman Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001)

13  (citation omitted). Ultimately, "the standard of review is a narrow one. The court is not

14  empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416;

15  *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir.

16  2001).

17    It is well-settled that an agency's decision is entitled to a deferential standard of review.

18  *Vermont Yankee Nuclear Power Corp. v. Natural Resource Defense Council*, 435 U.S. 519

19  (1978). However, "[w]hile courts must defer to an agency's reasonable interpretation of

20  equivocal scientific evidence, such deference is not unlimited. The presumption of agency

21  expertise may be rebutted if its decisions, even though based on scientific expertise, are not

22  reasoned." *Greenpeace v. NMFS*, 80 F. Supp.2d 1137, 1147 (W.D. Wash. 2000).

23    Finally, the Court is generally restricted to review of the administration record as it

24  existed at the time of the agency's decision. However, a court may properly consider extra-

25  record materials "to determine what matters the agency should have considered but did not,"

26

MEMORANDUM ORDER
PAGE - 6

1    *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980), and to help explain, complex,

2    technical matters, *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 n. 22 (9th Cir.

3    1992).  *See Seattle Audubon Society v. Moseley*, 798 F. Supp. 1473, 1477 (W.D. Wash. 1992).

4         **D.  Alleged NEPA Violations**

5         The National Environmental Policy Act ("NEPA") mandates the procedures by which

6    agencies must consider the environmental impacts of their decisions.  *See* 42 U.S.C. § § 4321, *et*

7    *seq*.  NEPA is essentially a procedural act, which seeks to ensure "a fully informed and well-

8    considered decision."  *Vermont Yankee Nuclear Power Corp. V. Natural Resources Defense*

9    *Council*, 435 U.S. 519, 558 (1978).  "It is now well settled that NEPA itself does not mandate

10   particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley*

11   *Citizens Council*, 490 U.S. 332, 350 (1989).  The processes established under NEPA focus the

12   attention of both the government and the public on a proposed agency action, so that the

13   environmental consequences can be studied prior to implementation of the proposed action, and

14   so potential negative impacts can be avoided.  40 C.F.R. § 1500.1(b); 40 C.F.R. § 1500.2(e);

15   *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989); *see Churchill County*

16   *v. Norton*, 276 F.3d 1060, 1072-73 (9th Cir. 2001).

17        NEPA requires a comprehensive EIS for "major federal actions significantly affecting

18   the quality of the human environment."  42 U.S.C. § 4332(C).  The Council for Environmental

19   Quality's ("CEQ") regulations implementing NEPA provides guidance as to the nature and

20   content of an EIS.  *See* 40 C.F.R. Part 1502.  The regulations direct agencies to "focus on

21   significant environmental issues and alternatives" in an EIS that is "concise, clear, and to the

22   point. . . ."  40 C.F.R. § 1502.1.  In an EIS, agencies are also required to describe "the

23   environment of the area(s) to be affected or created by the alternatives under consideration," and

24   to consider cumulative impacts.  40 C.F.R. § § 1502.15 and 1508.8.

25        *1.  MCR Project - Connected Action v. Cumulative Impact*

26

MEMORANDUM ORDER
PAGE - 7

Plaintiff argues that the Corps failed to analyze dredging of the Mouth of the Columbia River project ("MCR") within its Channel Deepening and Disposal EIS and within its Channel Maintenance EIS in violation of NEPA's requirement that connected actions be considered together. NEPA requires that all of the effects of closely related and dependant projects be considered together in a single EIS. 40 C.F.R. § 1508.25(a)(1). The regulations define "connected actions" as those which:

> (i)    Automatically trigger other actions which may require environmental impact statements.
>
> (ii)   Cannot or will not proceed unless other actions are taken previously or simultaneously.
>
> (iii)  Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1)(i)-(iii). An EIS must cover multiple actions when "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985). The Ninth Circuit uses an "independent utility" test to determine whether an agency is required to consider multiple actions in a single EIS.

Both defendants and intervenor-defendants argue that the MCR project is not a "connected action," and it need not be addressed in the EISs because it is a continuing project that has already been evaluated under NEPA standards. The Court agrees with defendants.

As highlighted by defendants, the MCR project and the proposed dredging action have independent utility. The MCR project has been operating for more than 20 years without the channel deepening project. The Corps has conducted separate NEPA analyses for the MCR project during that time. Thus, the Court agrees that there is nothing further for the Corps to evaluate under NEPA. Furthermore, the Court disagrees with plaintiff's argument that 40 C.F.R. § 1508.18(a) somehow compels a different result because it defines "action" as "new and continuing." Plaintiff's argument is flawed in that it apparently interprets the statute as "new *or*

MEMORANDUM ORDER
PAGE - 8

continuing," rather than "new *and* continuing," which defendants assert is the correct reading. Defendants' argument is supported by subsection (b) of the regulation, which sets forth several "actions," each of which is prefaced with the word "adoption" or "approval."  40 C.F.R. § 1508.18(b); *see also Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1304 (9th Cir. 2003) (explaining that "NEPA may require a comprehensive impact statement when several concurrent proposals have cumulative or synergistic impact").

The Court also agrees with defendants that the two projects are separate and distinct. The MCR project does not include maintenance of the existing 40-foot channel that is set to be deepened to 43-feet.  In addition, the maintenance of the MCR project and the Channel Deepening Project are funded separately from Congress.  Thus, the Court agrees that the Corps properly considered the MCR project in the FSEIS only as a "cumulative impact" rather than as a "connected action."

   *2. Channel Deepening EIS*

Plaintiff next argues that the Channel Deepening EIS failed to take a "hard look" at all of the direct and indirect effects of the project.  Specifically, plaintiff asserts that the Corps failed to disclose the direct and indirect effects of permanently removing large quantities of sediment from the estuary, the Corps failed to disclose the effects of toxic contaminants that will be mobilized by dredging, and the Corps failed to disclose the effects of dredging on estuary salinity.  Plaintiff further argues that the Corps has failed to completely analyze or even acknowledge the full impacts of past projects when combined with the effects of maintenance and channel deepening, the Corps never analyzed the cumulative effects of past and on-going flow regulation of upstream dams together with channel deepening and maintenance, and the Corp failed to fully analyze the impacts of future projects.  Plaintiff also alleges that the Corps has presented an incomplete picture of the costs and benefits of the project.  Finally, plaintiff argues that the Corps has failed to supplement its NEPA analysis based on significant new

1   information, including the loss of two of the three major container cargo shipping companies

2   that use the lower Columbia River.

3           Defendants answer that it adequately addressed all of those issues.  In particular, the

4   Corps highlights the fact that it used a model that has been used consistently all across the

5   country to address the salinity issue, as well as a second model that also found changes in

6   salinity will not be significant.  Defendants also note that they conducted a careful study of the

7   mechanisms used to transport sediment in the estuary, and found that there will be no change in

8   sediment movement because the channel deepening will not have a significant impact on flow.

9   In regard to the economic analysis, defendants note that they did not need to address jetty

10  erosion because that issue was never presented to the agency below, and the jetties are

11  deteriorating independently from the channel deepening project in any event.  Furthermore, an

12  independent panel found that the economic analysis complies with national guidance in this case.

13          Having reviewed the briefing and the administrative record before this Court, the Court

14  agrees with defendants that they took the requisite "hard look" under NEPA.  First, in 2000, the

15  States of Washington and Oregon denied certification of the project based on concerns about

16  sediment transport issues.  As a result, the Corps prepared a Revised Columbia River Sediment

17  Impacts Analysis, which was included in the FSEIS as Exhibit J.  The Corps concluded that

18  deepening the channel would not reduce the available sand supply, and that the expected

19  hydraulic changes would be too small to alter sand transport or erosion or accretion in the river

20  or estuary.  The States of Washington and Oregon subsequently granted certification of the

21  project based on the new analysis.  Thus, the Court agrees that the Corps did not fail to consider

22  the project's effects on sediment budget.

23          Second, the Court agrees with defendants that the Corps took a "hard look" at the

24  potential for exposing toxins from sources both outside and within the channel.  The record

25  shows that the Corps examined toxins from outside the channel, and found no significant levels

26

MEMORANDUM ORDER
PAGE - 10

1    of contamination in the areas tested.

2        Third, the Court also agrees that the Corps took a "hard look" at the effects of the

3    project on salinity in the estuary.  As noted above, the Corps and NMFS applied two models,

4    the WES R-10 and OSHU/OGI's ELCIRC, to assess the impact of channel deepening on

5    salinity.  The Corps concluded that the channel deepening project will have little or no impact on

6    salinity intrusion.  While plaintiff argues that these results are based on outdated, 1958

7    bathymetry information, the record actually shows that updated bathymetry information from

8    1992 was utilized.  Moreover, the SEI panel confirmed that the salinity effects were well

9    understood and that no further modeling was necessary.  For these reasons, the Court finds that

10   defendants took the requisite "hard look" at the salinity issues.

11       Finally, the Court turns to plaintiff's allegations that defendants failed correctly analyze

12   the costs and benefits of the project.  As a threshold matter, the Court first addresses

13   defendants' request to strike the Niemi declaration submitted by plaintiff in support of its

14   arguments.  Plaintiff has submitted a 23-page declaration by Mr. Ernest Niemi, which argues

15   that the Corps' economic analysis is "unreasonable and indefensible."  There are numerous

16   extra-record documents attached as exhibits to that declaration.  While the Court acknowledges

17   that it may properly consider extra-record materials "to determine what matters the agency

18   should have considered but did not," *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980),

19   and to help explain, complex, technical matters, *Idaho Conservation League v. Mumma*, 956

20   F.2d 1508, 1520 n. 22 (9th Cir. 1992), the Ninth Circuit Court of Appeals has made clear that

21   consideration of extra-record evidence "to determine the correctness of wisdom of the agency's

22   decision is not permitted."  *Asarco,* 616 F.2d at 1160.  *See also Southwest Center for Biological

23   Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996) (explaining that post-

24   decisional information may not be advanced as a rationalization for either sustaining or attacking

25   an agency's decision).  In the instance case, Mr. Niemi states that the purpose of his declaration

26

MEMORANDUM ORDER
PAGE - 11

1   is to "determine whether or not the FSEIS provides a misleading description of the project's

2   potential impacts."  The Court finds this an improper use of his declaration.  Accordingly, the

3   Court STRIKES Mr. Niemi's declaration, along with the attached exhibits, from the record, and

4   will not consider plaintiff's arguments based on that declaration.

5         Defendants argue that their economic analysis should be upheld because the panels

6   convened by the Corps' Independent Review Process reviewed the economic analysis and found

7   that it was both reasonably conducted and based on well-grounded factual assumptions and

8   economic principles, and the Corps closely followed applicable national guidance in performing

9   its analysis.  The Court agrees.

10         The Court further agrees that the departure of two shipping companies from the Port of

11   Portland does not trigger a new SEIS under NEPA.  The courts of this circuit have continuously

12   held that new information regarding traffic through, or usage of, a potentially-impacted habitat

13   does not trigger additional NEPA review where the information did not change the

14   environmental impacts of a proposed project.  *See, e.g., Airport Communities Coalition v.*

15   *Graves*, 280 F. Supp.2d 1207, 1218-19 (W.D. Wash. 2003).  It does not appear from the record

16   that the departure of the two shipping companies changes the project's environmental impacts;

17   therefore, it is not new information that requires another SEIS under NEPA.  Furthermore, the

18   information does not appear to be "new," as the Corps previously considered the likelihood that

19   shipping concerns would come and go from the Port of Portland due to market changes and

20   other factors.  Accordingly, the Court finds that defendants correctly analyzed the costs and

21   benefits of the project.

22         For all of the reasons set forth above, the Court rejects plaintiff's arguments that

23   defendants' decisions violated NEPA, or that they were "arbitrary and capricious."

24   Accordingly, the Court denies plaintiff's summary judgment motion on those issues, and grants

25   defendants' cross-motions for summary judgment.

26

MEMORANDUM ORDER
PAGE - 12

1

### E. Alleged ESA Violations

2          Congress enacted the Endangered Species Act ("ESA") in an effort to conserve the

3  ecosystems upon which threatened and endangered species depend, to provide a conservation

4  program for such species, and to enforce the laws aimed at reaching those goals.  *See* 16 U.S.C.

5  § 1531(b).  The mandate of the ESA is "that all Federal departments and agencies shall seek to

6  conserve endangered species and threatened species and shall utilize their authorities in

7  furtherance of the purposes of this chapter."  16 U.S.C. § 1531(c).  As the U.S. Supreme Court

8  stated in *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978):

9               Lest there be any ambiguity as to the meaning of this statutory directive, the
              Act specifically defined "conserve" as meaning "to use and the use of *all*
10            *methods and procedures which are necessary* to bring *any endangered*
              *species or threatened species* to the point at which the measures provided
11            pursuant to this chapter are no longer necessary."

12  *Tennessee Valley Authority*, 437 U.S. at 180 (emphasis in original).  The Court also emphasized

13  that "the legislative history undergirding § 7 reveals an explicit congressional decision to require

14  agencies to afford first priority to the declared national policy of saving endangered species."

15  *Id.* at 185.

16          Under the ESA, federal agencies are required to formulate a biological opinion as to

17  whether a proposed action is likely to jeopardize the continued existence of a listed species, or

18  result in the destruction or adverse modification of a critical habitat.  16 U.S.C. § 1536(a)(2) and

19  (b)(3)(A); 50 C.F.R. § 402.02.  If the biological opinion concludes that the action will jeopardize

20  a listed species, the opinion must include reasonable and prudent alternatives to the agency's

21  action plans.  *Id.*

22          A biological opinion "should address both the jeopardy and critical habitat prongs of

23  Section 7, by considering the current status of the species, the environmental baseline, the

24  effects of the proposed action, and the cumulative effects of the proposed action."  *Gifford*

25  *Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1063 (9th Cir. 2004) (citing

26

MEMORANDUM ORDER
PAGE - 13

1    50 C.F.R. § 402.14(g)(2)-(3)).

2         Section 7 of the ESA sets forth the rules pertaining to an agency consultation.  Under

3    section 7, every federal agency:

4         shall, in consultation with and with the assistance of the Secretary, insure that
          any action authorized, funded, or carried out by such agency (hereinafter in

5         this section referred to as an 'agency action') is not likely to jeopardize the
          continued existence of the endangered or threatened species or result in the

6         destruction or adverse modification of habitat of such species . . . unless such
          agency has been granted an exemption for such action by the [Endangered

7         Species] Committee. . . .

8    16 U.S.C. § 1536(a)(2).  Additionally, "[s]ection 7 and the requirements of this Part apply to all

9    actions where there is discretionary Federal involvement or control."  50 C.F.R. § 402.03.

10        In a section 7 consultation, the consulting agency must "[e]valuate the effects of the

11   action and cumulative effects on the listed species or habitat."  50 C.F.R. § 402.14(g)(3).  The

12   agency must then "[f]ormulate its biological opinion as to whether the action, taken together

13   with cumulative effects, is likely to jeopardize the continued existence of listed species or result

14   in the destruction or adverse modification of critical habitat."  *Id.*

15        "Cumulative effects" are "those effects of future State or private activities, not involving

16   Federal activities, that are reasonably certain to occur within the action area of the Federal

17   action subject to consultation."  50 C.F.R. § 402.02.  "Effects of the action" are "the direct and

18   indirect effects of an action on the species or critical habitat, together with the effects of other

19   activities that are interrelated or interdependent with that action, that will be added to the

20   environmental baseline."  *Id.*

21        The environmental baseline "includes all past and present impacts of all Federal, State,

22   private, and other human activities in the action area, the anticipated impacts of all proposed

23   Federal projects in the action area that have already undergone formal or early section 7

24   consultation, and the impact of State or private actions which are contemporaneous with the

25   consultation in process."  *Id.*

26

MEMORANDUM ORDER
PAGE - 14

1    In the instant case, plaintiff asserts that the NMFS has violated the ESA in several

2  respects.  First, plaintiff argues that NMFS has failed to draw a rational connection between the

3  evidence and its no-jeopardy conclusion.  Specifically, plaintiff asserts that NMFS cannot

4  rationally reconcile its conclusion that the project will not cause jeopardy to existing salmon

5  species with its unequivocal finding that the estuary's degraded conditions are currently not

6  meeting the species' biological needs.

7    Second, plaintiff argues that NMFS has not adequately identified or analyzed the

8  environmental baseline.  Specifically, plaintiff asserts that the NMFS failed to actually analyze,

9  with any specificity, the significance of the current environmental baseline condition for the

10  salmon species, and the NMFS failed to analyze precisely how degraded the baseline is, what

11  actions caused that degradation, what aspects of the species' needs have been impaired, and

12  whether the current degradation of the baseline leaves any room for additional adverse impacts

13  from channel deepening or O&M dredging without causing jeopardy.  The Court addresses each

14  argument in turn.

15    *1.  NMFS's No-Jeopardy Conclusion*

16    While plaintiff argues that NMFS cannot rationally reconcile its conclusion that the

17  project will not cause jeopardy to existing salmon species with its unequivocal finding that the

18  estuary's degraded conditions are currently not meeting the species' biological needs, the Court

19  is not persuaded.  ESA § 7(a)(2) requires that:

20          Each Federal agency shall, in consultation with and with the assistance of the
           Secretary, insure that any action authorized, funded or carried out by such
21          agency . . . is not likely to jeopardize the continued existence of any
           endangered species or threatened species or result in the destruction or
22          adverse modification of habitat of such species. . . . In fulfilling the
           requirements of this paragraph each agency shall use the best scientific and
23          commercial data available.

24  16 U.S.C. § 1536(a)(2).

25    Consequently, the statute requires NMFS to produce a biological opinion and a summary

26

MEMORANDUM ORDER
PAGE - 15

1    of the information on which the opinion is based, detailing how the proposed agency action will

2    affect the species or critical habitat.  16 U.S.C. § 1536(b)(3)(A).  To determine whether the

3    proposed action is "likely to jeopardize the continued existence of the species," NMFS must

4    determine whether the proposed action

5        reasonably would be expected directly or indirectly, to reduce appreciably the
         likelihood of both the survival and recovery of a listed species in the wild by
6        reducing the reproduction, numbers or distribution of that species.

7    50 C.F.R. § 402.02.  Additionally, when evaluating the "effects of the [proposed] action,"

8    NMFS must consider the

9        direct and indirect effects of an action on the species or critical habitat,
         together with the effects of other activities that are interrelated or
10       interdependent with that action, that will be added to the environmental
         baseline. The environmental baseline includes the past and present impacts of
11       all Federal, State or private actions and other human activities in the action
         area, the anticipated impacts of all proposed Federal projects in the action
12       area that have already undergone . . . consultation, and the impact of State or
         private actions which are contemporaneous with the consultation in process.
13       . . .

14   *Id.*

15       In the instant case, NMFS concluded that the "biological requirements of the ESA-listed

16   salmonids are currently not being met under the environmental baseline."  However, NMFS also

17   noted that part of the proposed action includes a restoration project by the Corps specifically

18   aimed at increasing the survival and recovery of those salmonids by restoring the spatial and

19   temporal diversity and connectivity of habitats available.  Thus, NMFS concluded that the

20   restoration component of the project will actually improve the environmental baseline in the

21   estuary, while the channel deepening project itself will have minimal impact on the listed species.

22   Accordingly, the Court finds that defendants can rationally reconcile its no-jeopardy

23   determination, and it does not appear to be arbitrary and capricious.

24       *2.  NMFS's Baseline Analysis*

25       Likewise, the Court finds that NMFS's baseline analysis is not arbitrary and capricious.

26

MEMORANDUM ORDER
PAGE - 16

1 Plaintiff argues that NMFS has not adequately identified or analyzed the environmental baseline

2 because it does not articulate "the degree to which the estuary's current degraded conditions,

3 when measured against the species' status, leave any 'room' to accommodate additional adverse

4 impacts without causing jeopardy." The Court finds that argument misguided because nothing

5 in the statute, regulations, or guidance requires such an express articulation.

6 The ESA requires a consulting agency to provide "a written statement setting forth the

7 Secretary's opinion and a summary of the information on which that opinion is based, detailing

8 how the [proposed] agency action affects the species or its critical habitat." 16 U.S.C.

9 § 1536(b)(3)(A). The Endangered Species Consultation Handbook, March 1998, explains that

10 the analysis of the environmental baseline must include only a description of the status of the

11 species within the action area and the factors affecting species environment within the action

12 area. As noted above, in the instant case, NMFS did indeed determine that the current

13 biological requirements of ESA-listed salmonids are not currently being met under the

14 environmental baseline. However, NMFS concluded that the proposed action would not

15 prevent or delay the achievement of properly functioning habitat conditions for those listed

16 species within the action area. The basis for that decision is included in the biological opinion,

17 identifying the biological requirements of the ESA-listed salmonids, providing an overview of

18 current environmental conditions in the estuary, and discussing the importance of the river and

19 estuary's physical process and resultant habitats to those species.

20 NMFS then examined potential consequences for the species of the impact of the project

21 on the environmental baseline, including the direct effects of the channel deepening project on

22 the listed salmonids, as well as the potential indirect effects of project activity on suspended

23 sediment, bedload, turbidity, salinity, bathymetry, tidal marsh and swamp habitats, shallow water

24 flats and water column. Thus, the Court agrees that NMFS fully evaluated the environmental

25 baseline and the effects of the action when added to that baseline, and it does not appear to be

26

MEMORANDUM ORDER
PAGE - 17

1   arbitrary and capricious.

2   ### III. CONCLUSION

3          Having reviewed plaintiff's motion for summary judgment (Dkt. #48), defendants' and

4   intervenor-defendants' oppositions and cross-motions for summary judgment  (Dkts. #54 and

5   #55), plaintiff's reply and response to the cross-motions (Dkt. #59), defendants' and intervenor-

6   defendants' replies (Dkts. #65 and #66), the declarations in support of those briefs, the lengthy

7   administration record and supplemental administrative record, and the remainder of the record,

8   the Court hereby DENIES plaintiff's motion for summary judgment, and GRANTS defendants'

9   and intervenor-defendants' motions for summary judgment.

10          As it appears that there are no further issues for this Court to decide, this case is now

11   CLOSED.

12          The Clerk shall forward a copy of this Memorandum Order to all counsel of record.

13

14          DATED this _15_ day of June, 2005.

15

16                                              /s/   Ricardo S. Martinez
                                                RICARDO S. MARTINEZ
17                                              United States District Judge

18

19

20

21

22

23

24

25

26

MEMORANDUM ORDER
PAGE - 18